# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

MICHAEL CAPERS,

                            Petitioner,

      vs.                                    9:17-CV-555
                                                  (BKS/ATB)

SUPERINTENDENT,

                            Respondent.

---

LOWELL R. SIEGEL, ESQ., Attorney for Petitioner
ALYSON J. GILL, Asst. Attorney General for Respondent
PAUL B. LYONS, Asst. Attorney General for Respondent

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

    This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

## I.    Background

    Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a judgment of conviction rendered in the Supreme Court, Schenectady County Court on January 31, 2012. *People v. Capers*, 129 A.D.3d 1313, 1313-14 (3d Dep't 2015). Petitioner was convicted after a jury trial of two counts of criminal possession of a weapon, second degree. *Id.* at 1314. On June 18, 2015, the Appellate Division, Third Department affirmed the petitioner's conviction. *Id.* On April 7, 2016, the New York Court of Appeals denied petitioner leave to appeal. *People v. Capers*, 27 N.Y.3d 994 (2016).

The petition in this case was filed on May 19, 2017.[1] (Dkt. No. 1).  Respondent has filed an answer and a memorandum of law.  (Dkt. Nos. 9, 10).  The state court records were filed under separate cover. (Dkt. No. 11).

Petitioner raises thee grounds for this court's review:

(1)    The prosecutor intentionally withheld exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

(2)    The petitioner's sentence is harsh and excessive.

(3)    One of the jurors committed misconduct by visiting the crime scene in violation of the Fourth and Fourteenth Amendments.

For the following reasons, this court finds that the petitioner may be denied and dismissed.

## II.  <u>Relevant Facts</u>[2]

Petitioner's conviction stems from his involvement in a March 2010 altercation between two groups of young people on Hulett Street in Schenectady, New York.  The first group included petitioner and three friends - Virgil Terry; his brother, Dashaun Terry; and the Terrys' cousin, Jalil Miles.  The second group included Catoria Pittman; her brother Alphonzo Pittman; Jasiem Harris; and Sheron Mills.  Petitioner and his friends drove onto Hulett Street in a green Chevy Trailblazer and stopped to speak with

---

[1] Petitioner in this case is represented by counsel.

[2] Respondent has included a detailed discussion of the facts herein. (Resp. Mem. of Law at 1-19) (Dkt. No. 9).  This court adopts those facts, has summarized them in this opinion, and has included some additional facts and citations to the record.

Catoria Pittman who was on the sidewalk. (Catoria: Trial Transcript "T." 760).[3]

When Catoria realized that the driver of the Trailblazer was Virgil Terry, who she knew well, she stepped off the sidewalk and approached the vehicle to speak with him. (Catoria: T. 760). As Catoria was speaking with Virgil, his younger brother Dashaun insulted her by asking Virgil "'Why are you talking to that hood bitch for so long?'" (Catoria: T. 764). Catoria testified that both she and Virgil were "shocked" at this statement. (Catoria: T. 765).

Catoria testified that the person who was sitting in the back seat of the car behind the driver, partially rolled down his window, displayed a gun, and told Catoria to "[s]tep away from the car bitch!"[4] (Catoria: T. 765-66). Catoria specifically stated that she saw the individual holding what looked like a "cop gun." (Catoria: T. 766-67). Although there were various versions of the facts in the witnesses' testimony, it appeared that Catoria was yelling during the discussion, and she may or may not have flicked her cigarette into the car.[5] After petitioner's threat, Catoria stepped away from the car, and the young men drove off. (Catoria: T. 767). As they were driving away, Alphonzo came over from across the street and announced loudly that he was not going

---

[3] The state court records in this case consist of a complete set of trial transcripts, which the court will cite as "T." (Dkt. No. 11-5). The records also contain the state court record on appeal, which the court will cite as "SR." (Dkt. Nos. 11-1 - 11-4).

[4] Catoria initially described this individual as "the dark-skinned one," even though she also testified that she recognized all the people in the vehicle. (Catoria: T. 765, 772). She referred to him as "Mikey" during her testimony, and she later identified petitioner in the courtroom as the individual who pointed the gun at her. (Catoria: T. 775, 800-801).

[5] Catoria testified that she did not recall flicking her cigarette at anyone in the Trailblazer, although she admitted that it was "possible" that she did so. (Catoria: T. 792, 834-35). Dashaun testified that he asked Virgil why he was talking with Catoria, referring to her as a "hood bitch," and in response, Catoria flicked her cigarette in Virgil's face. (Dashaun: T. 1059, 1093).

to "sit here and let someone disrespect his sister." (Catoria: T. 767-68, 820-21, 833-34). The Trailblazer then pulled over to the side of the road, and all four of the occupants got out of the car and walked back toward Catoria and Alphonzo. (Catoria: T. 768-70, 772, 834-35). Catoria and Alphonzo were joined by Jasiem Harris and Sheron Mills, and the two groups faced off. (Catoria: T. 771-72, 774-75, 835).

Catoria testified that there were some "choice of words,"[6] although she could not remember what those words were. (Catoria: 776, 835). Catoria testified that she attempted to restrain Alphonzo, told him to "forget it" and that it was not "worth it." (Catoria: 770-71, 835-37). Then Catoria heard gun fire. (Catoria: T. 776). She testified that she saw Dashaun, also known as "Stacks" shooting toward Alphonzo. (Catoria: T. 776-77). He shot twice. (*Id.*) The gun in Dashaun's hands looked "like a [black] cop gun." (Catoria: T. 777). Catoria also testified that she saw petitioner, "the same person who had shown [her] the barrel of the gun in the SUV," firing at her brother as he was running away. (Catoria: T. 778-79). Catoria testified that she also saw the gun in petitioner's hand, and it was a black "cop gun." (Catoria: T. 779). However, Catoria testified that Dashaun shot first. (*Id.*) Catoria gave varying accounts of the number of shots fired, who fired them, and what position her brother was in when the shots were fired. (Catoria: T. 776-77, 780, 840-43, 851, 853-54, 855).

Catoria testified that when Alphonzo turned to run away from the shooters, the petitioner ran after him and shot at him with the black "cop gun." (Catoria: T. 778-79). She also testified that after petitioner shot at Alphonzo, he leaned over a tree and

---

[6] Catoria may have meant to say that the group exchanged "choice words."

grabbed either his chest or his knee. (Catoria: T. 780-81). She told police that "Mikey" was the one who shot her brother in the leg. (Catoria: T. 854). Catoria also testified that she saw Jalil Miles stick his arm out, point it in Virgil's direction, and she saw Virgil's legs go up in the air, concluding that Miles shot Virgil. (Catoria: T. 783-87, 844-47, 850). Catoria testified that, no one in her group was carrying a gun. (Catoria: T. 789, 851). Alphonzo Pittman and Virgil Terry were fatally shot as a result of the altercation. 129 A.D.3d at 1313.

Dashaun Terry testified that he heard seven or eight gunshots, and that Miles and petitioner were both carrying black semi-automatic handguns. (Dashaun: 1066-67). Dashaun testified that Miles shot Alphonzo, and petitioner shot "into the crowd." (Dashaun: T. 1066, 1085, 1100, 1102-03). Dashaun conceded that in a prior proceeding he testified that he did not see who petitioner shot at. (Dashaun: T. 1103-04). Dashaun testified that, after the shooting, everyone ran, and that Dashaun pulled Virgil onto the sidewalk from the middle of the road. (Dashaun: T. 1069-70, 1104). Miles got back into the Trailblazer and drove up to Dashaun and Virgil, telling Dashaun to put Virgil in the car. (T. 1070-71). However, a woman told Dashaun that she had called an ambulance, and Dashaun decided to wait for the ambulance with his brother. (Dashaun: T. 1070-71). However, at Miles's direction, Dashaun retrieved a black semi-automatic handgun that was lying in the street and gave it to Miles in the Trailblazer. (Dashaun: T. 1071-72, 1101-02).

When the ambulance arrived, Virgil was taken to the hospital, and Dashaun was taken to the police station. (Dashaun: T. 1073). Dashaun only told the police that he

heard shots, and that Virgil had been injured. (*Id.*)  He did not tell the police the entire story because he did not want to be labeled a "snitch." (Dashaun: T. 1073-75). Dashaun was indicted in connection with the shooting on two counts of second degree murder and six counts of weapon possession, for which he could have faced sixty-five years to life imprisonment. (Dashaun: T. 1087, 1095-96, 1116-17).  Dashaun ultimately was offered a plea bargain in exchange for his "truthful" testimony at petitioner's trial. (Dashaun: T. 1112-13).  He pled guilty to possessing two weapons,[7] in return for which he would receive a determinate sentence of 10 and 15 years imprisonment, together with five years post-release supervision. (Dashaun: T. 1079-82, 1085-88, 1096-99, 1112-13).

Jamel Reed also testified for the prosecution.  Reed was "best friends" with Virgil Terry, and was like an "older brother" to petitioner, Jalil Miles, and Dashaun Terry. (Reed: T. 1067-71).  Reed testified that he and petitioner would confide in each other. (Reed: 1170-71).  Reed also testified that petitioner and Jalil Miles had taken part in a fight in September of 2009 after a Schenectady High School football game, and that this altercation resulted in "ongoing" animosity between Alphonzo's friends and petitioner's friends. (Reed: T. 1173-74).

Reed and petitioner were incarcerated together in the Special Housing Unit of the Schenectady County Jail, while petitioner was awaiting trial on these charges. (Reed: T. 1174-79, 1206).  Reed testified that he and petitioner discussed the shooting, in part,

---

[7] The plea was to possession of the weapon involved in this crime, and to possession of an unrelated handgun for which he was arrested after this crime and which led to his arrest for this incident. (Dashaun: T. 1048, 1075-76, 1086-87).

because Reed wanted to know how Virgil was killed. (Reed: T. 1176, 1179). Petitioner told Reed that petitioner, Dashaun, Virgil, and Miles drove to Hulett Street and "almost hit" Catoria, who began being loud and aggressive, and her brother Alphonzo then came onto the scene. (Reed: T. 1180-81). Petitioner told Catoria "Bitch, back away from the car," at which point, Catoria flicked her cigarette at the car. (*Id.*) Reed testified that petitioner did not mention whether he had pointed a gun at Catoria. However, he did tell Reed that he and his friends pulled their car off the road and all jumped out of the car, each armed with a nine-millimeter handgun. (Reed: T. 1180, 1182-83, 1189).

Petitioner told Reed that Dashaun was the first to shoot, but that petitioner also started shooting at Alphonzo, believing that he hit Alphonzo in the leg.[8] (Reed: T. 1180, 1182-84, 1191, 1211-12, 1215). Reed testified that he asked petitioner who had the nine-millimeter gun because he read that Virgil had been shot with a nine-millimeter. Petitioner told Reed that all of them had nine-millimeter guns, so it was impossible to determine who shot Virgil. (Reed: T. 1186). Petitioner also told Reed that Miles drove the Trailblazer away from the scene and that they left Virgil at the scene because the guns were in the car, and the young men did not wish to be arrested holding the guns.[9] (Reed: T. 1185-86, 1192, 1196-98).

No guns were recovered from the scene of the shooting. The police found eight

---

[8] As stated above, Catoria also told the police that petitioner shot her brother "in the leg." (Catoria: T. 854).

[9] Reed acknowledged that he was currently incarcerated as the result of a guilty plea to an unrelated attempted second degree murder, and that he received favorable treatment in that case in exchange for his testimony against petitioner. (Reed: T. 1166, 1210, 1213, 1218-20).

expended shell casings on the sidewalk in the area where petitioner and his friends were standing.  Firearms experts determined that the shell casings were fired from two or more operable semi-automatic nine-millimeter handguns. (Ericson: T. 536-42; Campbell: T. 1134, 1144-48; 1151-53, 1157-58).  The petitioner's DNA was found on a cup, which was found in the backseat cup holder of the Chevy Trailblazer, and petitioner could "not be excluded" as a donor for DNA found on the left rear interior door handle, where Catoria testified that he was sitting. (Ericson: 569-71, 572-74, Mukhtar: T. 898-901, 907).  Alphonzo sustained a fatal gunshot wound to his back.  The bullet perforated his spleen and heart.  He received a non-fatal gunshot wound to his right thigh. (Sikirica: T. 730-35, 739-40).  Virgil sustained a single gunshot wound to his right upper chest that perforated his heart and lungs. (Sikirica: T. 722-27, 739).

Petitioner did not present any witnesses or evidence.

## III.    Standard of Review

### A.    Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation and other citations omitted)); 28 U.S.C. § 2254(b)(1). The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Id.*; *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994).

"A habeas petitioner has a number of ways to fairly present a claim in state court without citing 'chapter and verse' of the Constitution, including '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.'" *Hernandez v. Conway*, 485 F. Supp. 2d 266, 273 (W.D.N.Y. 2007) (quoting *Daye v. Attorney General*, 696 F.2d 186, 194 (2d Cir.1982)).

If the court finds that petitioner has failed to exhaust his claims, but he cannot return to state court, petitioner's claims are then be "deemed" exhausted, but would be barred by procedural default. *Bossett v. Walker*, 41 F.3d 825, 828-29 (2d Cir. 1994). A state prisoner who has procedurally defaulted on a federal claim in state court may only obtain federal habeas review of that claim if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that the constitutional violation has resulted in the conviction of one who is "actually innocent." *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012); *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (internal quotation and citations omitted). The actual innocence prong is referred to as the fundamental miscarriage of justice exception. *Rivas, supra*. "Cause" exists if "the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been different

absent the alleged constitutional violation. *Stickler v. Greene*, 527 U.S. 263, 289 (1999).

## B.    Merits

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254

> unless the adjudication . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. 2254(d); *Kernan v. Hinojosa*, 578 U.S. __, __, 136 S. Ct. 1603, 1604 (May 16, 2016) (per curiam); *Hittson v. Chatman*, 576 U.S. __, __, 135 S. Ct. 2126, 2126 (Jun. 15, 2015); *Johnson v. Williams*, 568 U.S. __, __, 133 S. Ct. 1088, 1091 (Feb. 20, 2013); *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)) (alterations in original).  Clearly established federal law "means 'the holdings as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003); *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)) (alterations in original).  Circuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court [under] § 2254(d)(1)." *Glebe v. Frost*, 547 U.S. __, __, 135 S. Ct. 429, 431 (Nov. 17, 2014) (per curiam).

A decision is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by the [Supreme Court] on a

question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts," or if the state court identifies the appropriate legal standard, but unreasonably applies it to the facts of the petitioner's case. *Williams*, 529 U.S. at 413. The lower court may not grant the writ if it concludes "in its independent judgment" that the state-court decision applied clearly established federal law erroneously or incorrectly; rather, the application must also be unreasonable. *Id.* at 411.

In order for the application to be "unreasonable," there must be "some increment of incorrectness beyond error," but that increment may not be too great, otherwise habeas relief would be limited to those state court decisions that are "so far off the mark as to suggest judicial incompetence." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). A state court's decision must stand as long as "fairminded jurists could disagree on the correctness . . . of the decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citation and internal quotation marks omitted). In addition, factual determinations made by the state court are presumed to be correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In order to apply this standard under the AEDPA, the petitioner's claim must have been "adjudicated on the merits" in the state court proceedings. 28 U.S.C. § 2254 (d)(1). *See also Day v. Taylor*, 459 F. Supp. 2d 252, 256 (S.D.N.Y. 2006) (a federal court's ability to review a habeas petition depends on whether the state court adjudicated the petitioner's claims on the merits or on procedural grounds). If the state

court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo*. *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

## IV. *Brady v. Maryland*

### A. Legal Standards

A prosecutor has the duty under *Brady v. Maryland*, 373 U.S. 89 (1963) to produce material, exculpatory evidence to the defense. To prevail on a *Brady* claim, petitioner must show that the prosecution suppressed evidence favorable to him, and that the evidence was material either to guilt or punishment. *Brady*, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987).

A Brady violation consists of three factors: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Simpson v. United States*, 693 F. App'x 33, 34 (2d Cir. 2017) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)); *Castellanos v. Kirkpatrick*, No. 10-CV-5075, 2017 WL 2817048, at *15 (E.D.N.Y. June 29, 2017) (quoting *Strickler, supra*). Evidence is material and prejudice results if "'there is a

12

reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (quoting *United States v. Madori*, 473 F.3d 159, 169 (2d Cir. 2005)). A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Id.*

### B.    Application

In this case, petitioner's attorney discovered references to two reports while he was reviewing the petitioner's Presentence Investigation Report ("PSI"). Counsel informed the trial judge that these two police reports were never disclosed to the defense. The judge directed the prosecutor to produce the reports. The prosecutor complied with the court's direction, and these two reports, written by Detective John Madden, became the basis for the petitioner's "supplemental" motion to vacate his conviction, in which petitioner argued that the two reports were *Brady* material and should have been disclosed to petitioner prior to the trial.

In the first report, Detective Madden stated that, on March 31, 2010, he was in plain clothes in a car, parked in the driveway of the Brandywine Diner in Schenectady. (SR 141). He was assigned to do surveillance on 949 Emmett Street, where the Chevy Trailblazer was parked. (*Id.*) He was watching the vehicle while other detectives were preparing an application for a warrant to search it. The vehicle was registered to Virgil Terry's aunt. Detective Madden stated that at approximately 1:30 p.m., he observed "a black female with a large build exit a black Chrysler Pacifica. She began speaking with an older black female who was walking by with a child.

Detective Madden overheard part of their conversation. The female who had

exited the Pacifica told the other woman that her nephew was the one who was killed on Hulett Street. Detective Madden missed the next part of the conversation due to vehicle noise, but then overheard the woman say that "'the boy was shooting, he shot my nephew and shot his brother too.'" (SR at 141). She also mentioned "something about everyone being "'up here' by around 1:00AM," but Detective Madden did not hear the rest of that conversation either. (*Id.*)

The police later determined that the Pacifica was registered to Charlotte George, but when Detective Thomas Adach went to attempt to interview her, he was unable to locate her. (SR 142-45). A handwritten memorandum, dated "May 23, 2011"[10] indicates that Charlotte George came "into the office this date." (SR 146). The memorandum states that Ms. George had "no direct knowledge about the murder," the night of the murder she was with Shaquilla Cridelle's[11] mother, and they went to the scene to locate Shaquilla. Alphonzo Pittman was her nephew, but Ms. George was not able to provide any other information about the incident. (*Id.*) There was no further reference to, or clarification of, the statements about the shooting overheard by Detective Madden.

The second report stated that Detective Madden received an "anonymous tip" about the incident on March 29, 2010. (SR 147-48). The "tip" came from a male

---

[10] Although it appears that this memorandum was dated in 2011, there may be an error in the date. The investigation was going on in 2010, and all the other documents in question are dated in 2010. (*See e.g.* T. 145 - detective indicates that on April 5, 2010, he attempted to interview Charlotte George "who was heard talking about the homicide.") It would make more sense that Ms. George went to speak with the police in May of 2010, not May of 2011.

[11] Shaquilla Cridelle was Alphonzo Pittman's girlfriend, was at the scene of the shootings, and as stated above, testified at trial.

telephone caller, who stated that "information on the street" was that "'Stacks'"[12] killed his brother by accident. (SR 148). The caller further stated that Catoria flicked a cigarette in Stacks's face, people were yelling "Shoot the bitch," and Alphonzo was "sticking up for" his sister, when Stacks and his brother[13] confronted him with handguns. (*Id.*) The caller stated that Stacks shot Alphonzo, but accidentally shot his brother too. The caller stated that "many people" then jumped into the green Trailblazer, but Stacks stayed with his brother and waited for the police. (*Id.*) Detective Madden's report also stated that the "same male" called back later and stated that " a 'Mike' may have also been involved as a shooter." (*Id.*)

The trial court denied petitioner's supplemental motion to vacate based on the *Brady* claim. (SR 154-58). The court found that the reports were not *Brady* material because information inculpating Dashaun Terry was not exculpatory of petitioner because petitioner had been prosecuted as both a principal actor and an accessory to the criminal conduct of others, including Dashaun Terry. (SR 157). The court also found that, even if the reports were considered *Brady* material, there was no prejudice because there was no "reasonable possibility" that the verdict would have been different if the reports had been disclosed. (SR 157-58).

There is no dispute that petitioner exhausted his state court remedies by bringing his federal *Brady* claim on appeal, and the state courts deciding the issue on the merits. Therefore, the AEDPA standard applies to this court's analysis. Petitioner argued on

---

[12] "Stacks" was Dashaun Terry's nickname.

[13] Stacks's brother, Virgil Terry, was the other murder victim.

appeal that these two reports were *Brady* material because they were either exculpatory or would have been useful to impeach Dashaun Terry. Petitioner argued that the reports indicated that Dashaun Terry shot both victims, thus exculpating petitioner.

The Appellate Division disagreed with petitioner, finding that "[s]ince defendant was not convicted of murder in the second degree - the charges to which this allegedly exculpatory material relates - we perceive no prejudice from the nondisclosure relative to those charges." 129 A.D.3d at 1316. The court also held that while the information was "arguably relevant for purposes of impeaching Terry, in view of the overall evidence implicating defendant, there is no reasonable probability that the disclosure of these statements would have resulted in a different outcome." *Id*.

This court finds that the Appellate Division did not act contrary to *Brady* in its decision, nor did the court reach a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Even assuming that the reports were "exculpatory" for the murder charges, neither report was exculpatory with respect to the petitioner's conviction for possessing the gun. Even if both victims were killed by bullets from Dashaun Terry's gun, the testimony was clear that most, if not all, of the young men in the car were armed. Catoria testified that petitioner pointed a gun at her, and there was other testimony that petitioner shot into a crowd. Petitioner was not convicted of the murders, therefore, no prejudice resulted from the failure of the prosecution to disclose the evidence that might have been relevant to those charges.

Moreover, the failure to produce evidence does not violate *Brady* when the

suppressed statements consist of hearsay or speculation and would have been inadmissible at trial, or "could [not] possibly [have led] to admissible evidence." *United States v. Polanco*, 510 F. App'x 10, 12 (2d Cir. 2013) (citing *Santos*, 2010 WL 2985913, at *6). In this case, detective Madden's statement regarding the "anonymous caller" included a second call in which the caller stated that "Mike" may have been involved "as a shooter." The caller prefaced his first statement with the comment that his information was "word on the street." Ms. George clearly did not witness the incident, and she was relating hearsay to another woman on the street, which was only partially overheard by Detective Madden. The detective stated in the report that he did not hear part of the conversation due to vehicle noise. When Ms. George finally spoke with the police, she stated that she did not know anything about the incident. Neither report would have been admissible at trial, nor given the facts, could the reports have led to the discovery of admissible evidence. Thus, there is no indication that petitioner was prejudiced as a result of his failure to obtain the two reports prior to trial.

The same is true for the impeachment value of the reports. The Second Circuit has denied a *Brady* claim when the evidence "consisted of rumors amounting to inadmissible hearsay; would not have led to admissible evidence because the author of the statement could not identify a single source for the statements; and, did not provide valuable impeachment evidence, given that the impeachment evidence against the prosecution's main witness was already overwhelming. *United States v. Santos*, 486 F. App'x 133, 135-36 (2d Cir. 2012) (citing *United States v. Jackson*, 345 F.3d 59, 74 (2d Cir. 2003) ("[A] new trial is generally not required . . . when the suppressed

impeachment evidence merely furnished an additional basis on which to impeach a witness whose credibility has already been shown to be questionable."); *Mack v. Conway*, No. 10-3414, 2012 WL 1232951, at \*2 (2d Cir. Apr. 13, 2012) (quoting *United States v. Wong*, 78 F.3d 73, 79 (2d Cir .1996)) (internal quotations marks omitted)).  When undisclosed impeachment evidence is "possibly useful to the defense," but "not likely to have changed the verdict," the undisclosed impeachment evidence is "not material in the *Brady* sense." *Blalock v. Smith,* No. 08 CIV. 7528 JPO, 2012 WL 3283439, at \*11 (S.D.N.Y. Aug. 13, 2012) (quoting *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)) (internal quotation marks omitted)).

In this case, the jury was well aware that Dashaun Terry's credibility was "questionable."  The reports would have contradicted Dashaun's testimony at trial that he was not carrying a gun at the time of the shootings.  However, there was ample evidence to impeach Dashaun Terry's trial testimony.  Catoria Pittman testified that Dashaun was carrying a gun.  Dashaun admitted during his testimony at petitioner's trial that he pled guilty in a separate criminal action to the weapons possession charges in this case, and that he was getting a very favorable deal in exchange for his testimony against petitioner. (T. 1095-99).  Dashaun's statement that he was not carrying a gun was explained by the prosecution in summation as Dashaun's failure to bring himself to admitting that he might have fired the shot that killed his own brother by mistake. (T. 1360).  Thus, the failure of the prosecution to disclose the two reports did not violate *Brady* because the reports were not "material."

Finally, the petitioner's convictions for possession of a weapon were supported by sufficient evidence. Petitioner was charged both as a principal and with accessorial liability. The jury was instructed on accomplice liability and constructive possession. There was ample evidence at trial to show that petitioner was present and acted together with his friends in possessing the weapons, regardless of whose weapon actually fired the fatal shots.

Thus, the Appellate Division's rejection of petitioner's claim was not contrary to *Brady*, and petitioner's *Brady* claim may be dismissed.

## V.  **Excessive Sentence**

### A.  **Legal Standards**

An excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *Hernandez v. Superintendent*, No. 17 Civ. 2457, 2018 WL 502784, at *5 (S.D.N.Y. Jan. 22, 2018) (citing inter alia *Vassar v. Artus*, No. 08-CV-0041, 2016 WL 3632712 at *7 (N.D.N.Y. June 29, 2016) ("It is well settled that an excessive sentence claim may not be raised as grounds for federal habeas corpus relief if the sentence imposed was within the range prescribed by state law."); *Quintana v. Lee*, No. 12 Civ. 3204, 2016 WL 2755918 at *5 (S.D.N.Y. May 11, 2016)). A petitioner's claim that the sentencing judge abused his discretion in his or her sentencing decision is generally not a federal claim that is subject to review by habeas corpus. *Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir. 1977) (finding no cognizable federal claim when petitioner alleged that the state judge abused his sentencing

discretion).  In order to raise a constitutional claim, a petitioner must show that the trial

court's sentencing decision amounted to an improper "arbitrary or capricious abuse of

discretion" that deprived the petitioner of his liberty.  *Herrera v. Artuz*, 171 F. Supp. 2d

146, 151 (S.D.N.Y. 2001).

The Eighth Amendment forbids extreme sentences which are "grossly

disproportionate" to the crime of conviction. *See Lockyer v. Andrade*, 538 U.S. at

72-73; *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (citations omitted).  The gross

disproportionality principle is applicable only in "exceedingly rare" and "extreme"

cases. *Id.* at 73, 77 (citing *Harmelin*, 501 U.S. at 1001).

### B.    Application

In this case, petitioner was convicted of two counts of second degree criminal

possession of a weapon, Class C violent felonies.  He received concurrent determinate

sentences of 14 years with five years post-release supervision.  Although the sentence

was close to the maximum 15 years, with five years post-release supervision, the

petitioner's sentence was clearly within the maximum range prescribed by state law.

*See* N.Y. Penal Law §§ 70.02(3)(b) (determinate term mandatory for a non-youthful

offender is 3 ½ - 15 years), 70.45(2)(f) (the determinate sentence shall include a term of

post-release supervision of 2 ½ - 5 years).

In his state court appeal, petitioner argued that the sentence was "unduly severe

in light of the record and facts of this case." (SR 241-46).  Counsel argued that

petitioner should have been declared a youthful offender, and even assuming that he

was correctly sentenced as a "non-youthful offender," he was still extremely young, had

20

a history of pursuing his education, had "positive actions" while incarcerated, had strong potential for rehabilitation, and was remorseful. (SR 246).  Counsel also argued that the petitioner's sentence should have been closer in length to the plea bargain that prosecutor originally offered petitioner.[14] (SR 245).  Counsel argued that the extra sentence was punitive in nature and in retaliation for petitioner exercising his right to trial, taking into consideration the favorable plea bargain that plaintiff was offered. (*Id.*)  Petitioner offered no other facts that would have supported such a claim of vindictiveness.  Counsel never mentioned the Eighth Amendment or constitutional law as a basis for his argument to the Appellate Division.

The Appellate Division denied petitioner's claim on the basis of state law and an analysis of the facts supporting the trial court judge's decision, finding no abuse of discretion. 129 A.D.2d at 1318-19.  The court specifically, and correctly, found that petitioner was not eligible for youthful offender status based upon New York Penal Law § 720.10(2)(a) which states that every youth[15] is eligible for youthful offender status "unless: (a) the conviction to be replaced by a youthful offender finding is . . . (ii) an armed felony[16] as defined in subdivision forty-one of section 1.20, except as

---

[14] Earlier in the criminal proceedings, petitioner rejected a plea bargain offered by the prosecutor, according to which petitioner would have pleaded guilty to either second degree criminal possession of a weapon or second degree manslaughter, in exchange for a determinate sentence of 10 years imprisonment plus post-release supervision. (SR 245).

[15] A "youth" is defined as an individual who was at least 16 years old and less than nineteen years old at the time the crime was committed. N.Y. Penal Law § 720.10(1).  There is no dispute that at 16, petitioner was a "youth" under the statute.

[16] An "armed felony" is "any violent felony defined in section 70.02 of the penal law that includes as an element the possession of a loaded weapon or the display of "what appears to be" various firearms. N.Y. Penal Law § 41.  Section 70.02 of the New York Penal Law includes second degree criminal possession of a weapon "as defined in section 265.03." N.Y. Penal Law § 70.02(1)(b)

provided in subdivision three . . . ." N.Y. Penal Law § 720.10(2)(a)(ii).  In addition, the Appellate Division found that the petitioner failed to establish mitigating circumstances or that he only played a minor role in the crimes.[17] *Id* at 1318-19.

The form-petition itself states that the trial court violated the petitioner's "8th Amendment Rights" because it was "reflective of the charges that had been dismissed upon a hung jury, and not the charges of which [he] was actually convicted." (Pet. at 8) (Ground Two) (Dkt. No. 1).  Petitioner states that his "supplemental" motion to vacate was based on the Eighth Amendment and unduly harsh based on petitioner's "limited criminal history." (*Id.*)  Petitioner then refers to his brief to the Third Department Appellate Division at "pgs 84-89." (*Id.*)

To the extent that petitioner bases his argument on his state court papers,[18] this court finds that petitioner's sentencing claim is not cognizable on habeas review.  The sentence was within the maximum sentence prescribed by state law. Petitioner did not claim on appeal that the sentence was "disproportionate to the crime."  Rather, petitioner argued that, in view of the facts of the case, and his particular situation, the

---

(defining a Class C violent felony offense).  Finally, the elements of second degree criminal possession of a weapon are, inter alia, possession of a loaded firearm, with intent to use the same unlawfully against another. N.Y. Penal Law § 265.03(1)(b).

[17] New York Law provides that the defendant may argue that, even though he is not statutorily eligible for youthful offender status due to the nature of the crime, he may attempt to establish "mitigating circumstances" or that he had a "minor role" in the crime. N.Y. Penal Law § 720.10(3).  If the defendant is successful in establishing mitigating circumstances, the court may exercise its discretion and sentence the defendant as a youthful offender. *See People v. Middlebrooks*, 25 N.Y. 32 516, 527-28 (2015).

[18] The petitioner herein is represented by counsel.  Petitioner's counsel has not filed a separate memorandum of law in support of his petition.  He filed a copy of petitioner's state court appellate brief which was written by the attorney who represented petition on his state court appeal.

sentence was harsh and excessive.  In his state court appeal, petitioner requested that the "Court should exercise its discretion by modifying the non-youthful offender sentences . . . to reflect minimum, concurrent terms . . . ."  The Appellate Division disagreed with petitioner's argument and denied his claim.

To the extent that petitioner is now attempting to raise an Eighth Amendment claim in his petition, he has not exhausted his state court remedies with respect to such a claim.  Petitioner never raised an Eighth Amendment claim in his direct appeal.  In his form-application, petitioner notes that his appellate brief raises a claim that his sentence was harsh and excessive due to his limited criminal history.  As stated above, such a claim is not constitutionally based.

Although petitioner states in the petition that his "Supplemental Motion" to vacate was based upon his Eighth Amendment sentencing claim, a review of the motion shows that it was **not** based on his current constitutional sentencing arguments. (SR 754-57).  The "supplemental motion" was based on petitioner's *Brady* claim alone. Although petitioner also filed a motion to vacate his conviction prior to sentencing[19] pursuant to N.Y. Crim. Proc. § 330.30, this motion was based on petitioner's claim that the verdict was against the weight of the evidence. (SR 751-53).  In any event, even if petitioner had raised his constitutional claim in the motions to vacate, he would still have been required to raise the claim on appeal in order to properly exhaust his Eighth Amendment sentencing claim. *See Bossett v. Walker*, 41 F.3d at 828 (petitioner must

---

[19] The motion is dated November 17, 2011, and according to the "supplemental motion," sentencing was adjourned to November 18, 2011.  Thus, petitioner's section 330.30 motion could not have included an excessive sentence claim because petitioner had not been sentenced when the motion was filed.

bring his constitutional claim to the highest court available for review). Thus, petitioner has failed to exhaust an Eighth Amendment sentencing claim.

Respondent argues that although petitioner's Eighth Amendment sentencing claim is unexhausted, he could return to state court and assert his federal claim pursuant to New York Criminal Procedure Law § 440.20, which provides for a challenge to the legality of a sentence. The statute provides that a section 440.20 motion may be made before the trial court "[a]t any time after the entry of a judgment. N.Y. Crim. Proc. Law § 440.20(1). Moreover, petitioner is not procedurally barred from filing a section 440.20 motion, notwithstanding his failure to raise the issue on appeal. *See Koso v. Attorney General*, No. 12-CV-1723, 2015 WL 1286014, at *4 (E.D.N.Y. Mar. 20, 2015) (citing *People v. Collier*, 79 A.D.2d 1162, 1163 (3d Dep't 2010)).

The failure to exhaust one of petitioner's claims renders this a "mixed-petition," containing some exhausted and some non-exhausted claims. The habeas statute provides that a petition may be denied on the merits, notwithstanding the failure to exhaust state court remedies, assuming there is no procedural bar. 28 U.S.C. § 2254 (b)(2). In the absence of specific guidance from the Second Circuit, lower courts in this circuit have applied two standards to determine whether a claim should be dismissed on the merits, notwithstanding the failure to exhaust. *See Hernandez v. Conway*, 485 F. Supp. 2d at 273 n.1. A majority of lower courts use a "patently frivolous" standard, while others use a "non-meritorious" standard, dismissing a claim when it is "perfectly clear that the [petitioner] does not raise even a colorable federal claim." *Id.* (collecting

cases).[20]

In this case, the court opts to recommend that the sentencing claim be denied on the merits, notwithstanding petitioner's failure to exhaust.  As stated above, the petitioner's sentence, although severe, was within the maximum authorized sentence for second degree criminal possession of a weapon.  The Appellate Division specifically found that the judge did not abuse his discretion in sentencing this petitioner based on the facts of the case.  The petitioner has no basis for a disproportionality claim.

Petitioner's new claim that the judge imposed a harsher sentence based on the charges that were dismissed is patently frivolous as is his claim that he was "punished" for not accepting the plea bargain.  The sentence was within the maximum for the charges of which he was convicted.  Therefore, petitioner cannot show that he was sentenced based on the murder charges for which he was not convicted.  The Appellate Division stated that

> In spite of the defendant's youth and sparse criminal history, we find no abuse of discretion in the sentence imposed by the Supreme Court, especially considering the violent nature of the altercation that left two people dead.

129 A.D.3d 1319.  The court was not sentencing petitioner for the death of the two young men, rather, the court was sentencing the petitioner to a more severe sentence within the range of the crime for which he was convicted because of the violent "nature

---

[20] In finding that a "non-meritorious" standard was more appropriate, one court referenced Justice Steven's concurrence in the Supreme Court decision in *Duncan v. Walker*.  *Basnight v. Keane*, No. 99-CV-5907, 2001 WL 901139, at \*5 n. 1 (E.D.N.Y. July 31, 2001).  Justice Stevens stated that "the AEDPA gives a district court the alternative of simply denying a petition containing unexhausted but nonmeritorious claims."  *Duncan v. Walker*, 533 U.S. 167, 183 (2001) (emphasis added).

of the conduct" which resulted in the death of two people.  The nature of the conduct is

an acceptable consideration in sentencing.  In addition, as the respondent points out, the

fact that petitioner received a more severe sentence after trial, by itself, is not a basis to

find that he was punished for going to trial. *See United States v. Mazzanatto*, 519 U.S.

196, 209-210 (1995) ( "While confronting a defendant with the risk of more severe

punishment clearly may have a 'discouraging effect on the defendant's assertion of his

trial rights, the imposition of these difficult choices [is] an inevitable'- and permissible

-'attribute of any legitimate system which tolerates and encourages the negotiation of

pleas.'")  "Federal courts routinely reject vindictive sentencing claims based on the

disparity between sentences offered during the plea bargaining process and imposed

after a guilty verdict." *McCallum v. Graham*, No. 6:14-CV-6571, 2016 WL 3079783, at

*10 (W.D.N.Y. June 1, 2016) (citing *Archie v. Strack*, 378 F. Supp. 2d 195, 200-01

(W.D.N.Y. 2005) (citing, inter alia, *Corbitt v. New Jersey*, 439 U.S. 212, 219, 223

(1978)).

Petitioner cites no basis, other than the difference in the length of the sentence,

for his conclusory assertion that the judge punished him with a more severe sentence

based on his refusal to take the plea offer. *See also Echevarria Perez v. Burge*, 779 F.

Supp. 2d 326, 338 (W.D.N.Y. 2011) (the fact that the sentence imposed after trial and

conviction was greater than that offered to Echevarria–Perez during plea negotiations

does not make the sentence illegal, and that, standing alone, does not establish that

judge based the length of the sentence on Echevarria's refusal of the plea offer).  Thus,

this petitioner's unexhausted Eighth Amendment claim is patently frivolous and may be

dismissed.

## VI. <u>Juror Misconduct</u>

### A.    Legal Standards

Due process requires that the defendant receive a jury trial by a jury that is "free from outside influences," and which bases its decision on the evidence in court. *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966); *Chin v. Graham*, No. 11-CV-5149, 2017 WL 3736724, at *6 (E.D.N.Y. Aug. 29, 2017) (citing *Sheppard, supra*). Moreover, the Sixth Amendment guarantees the defendant the right to a "fair trial by a panel of impartial, 'indifferent jurors.'" *See Norcutt v. Miller*, No. 9:15-CV-221, 2016 WL 7429440, at *5 (N.D.N.Y. Dec. 23, 2016) (quoting *Irwin v. Dowd*, 366 U.S. 717, 722 (1961)), *appeal dismissed*, No. 17-84 (2d Cir. Feb. 15, 2017).

*Sheppard* dealt with inflammatory publicity which surrounded a criminal trial, but "outside influences" would also include visits to the crime scene by individual or multiple jurors.  The totality of the circumstances surrounding the exposure determines whether the trial was fundamentally unfair, and each case must turn on its special facts. *See Norcutt v. Miller*, 2016 WL 7429440 at *5 (citations omitted).

### B.    Application

In this case, petitioner argues that his rights under the "Fourth and Fourteenth"[21] Amendments were violated "based upon the unauthorized juror visitation of the crime scene." (Pet. Ground Three).  At petitioner's trial, during jury deliberations, the

---

[21]As noted by respondent, it is unclear why petitioner's counsel has cited to the Fourth Amendment as a basis for his argument.  However, the court will consider the appropriate constitutional provisions in making its determination.

foreperson discussed one of the other jurors with the trial judge. (Trial Transcript ("T") at 1560). The foreperson stated that he and some of the other jurors believed that one of the jurors was not maintaining "open-mindedness" and that she mentioned to the jury that she had "family" living on Hulett Street.[22] (T. 1560-61). The foreperson also stated that the juror in question mentioned that she was going to attend a birthday party for her niece on Hulett Street, and she was told by the other jurors that they did not know if they felt "comfortable" with her attending the party in view of the judge's instructions to stay away from the area during the trial. (T. 1561).

The judge questioned the foreperson about the juror's exact statements. The foreperson stated that he did not "know if she went." (T. 1561). The juror also allegedly stated that, if she went, she did not know how long she would stay. She would "'probably just drop off the present and leave.'" (T. 1562). Apparently the conversation with the juror took place on a Friday, the birthday party was scheduled to be on Sunday, and the foreperson spoke to the judge on Monday when the trial reconvened. (T. 1561-62). However, the foreperson never asked the juror in question whether she had actually attended the party. When the judge asked whether there had been any discussion "as to whether or not she in fact went to Hulett Street [], the foreperson stated "[h]onestly no. I didn't want to go there. I assumed she would, hopefully, do the right thing and not go."[23] (T. 1562). The foreperson told the judge

---

[22] As stated above, Hulett Street was the location of the crime for which petitioner was on trial.

[23] Although the court also discussed the juror's lack of "open-mindedness," this alleged problem was not related to the possible visit to the neighborhood of the crime scene, and petitioner has not raised this issue as a basis for his claim. He only alleges that the juror committed misconduct by "visiting" Hulett Street.

that some of the other jurors had encouraged the foreperson to speak with the judge about their issues with the particular juror. (T. 1563, 1564).

The court then asked the foreperson to return to the jury room, and the judge spoke to both defense counsel and the prosecutor regarding this issue. (T. 1564-65). The judge asked both counsel what they would suggest that the court do in the situation, and both attorneys stated that they "did not know." (T. 1565). The judge asked counsel whether he should "question the juror in question." (*Id.*) The prosecutor agreed that the judge should question the juror, but defense counsel did not believe that any inquiry was necessary. (T. 1565). An "off-the-record" discussion was held at that point, and when the court went back on-the-record, the prosecutor suggested that the judge give an *Allen* charge,[24] while defense counsel argued that the court should allow the jurors to continue deliberating because the jury had not yet indicated as a whole that they were unable to reach a verdict. (T. 1566-67). The court ultimately gave the jury an *Allen* charge, after discussing the content of the charge with counsel. (T. 1574-80).

Respondent argues that petitioner has failed to exhaust his juror misconduct claim and that, because he has no further avenue to raise this claim in state court, the claim is procedurally defaulted and must be dismissed.

On direct appeal, petitioner raised a claim that his counsel was ineffective in three respects. (Pet. App. Br. at 43-48). One of the bases for petitioner's claim of ineffective assistance of trial counsel was that counsel failed to request a hearing to

---

[24] An Allen charge encourages a deadlocked jury to come to a unanimous verdict in the interest of avoiding retrial, without forcing any one juror to compromise his or her view of the case. *United States v. McDonald*, 759 F.3d 220, 224 25 (2d Cir. 2014). *See Allen v. United States*, 164 U.S. 492, 501 (1896).

"cross-examine" the juror who "apparently" visited the crime scene during the course of the trial. (*Id.* at 44, 47-48). Petitioner argued that there was no strategic or legitimate reason for counsel not to request a hearing on the issue in order to determine whether the "juror was improperly influenced against Michael based upon what she observed at the crime scene." (*Id.* at 48). Petitioner did not raise a stand-alone claim of juror misconduct.

The Appellate Division found that counsel was not ineffective, and that "defendant received meaningful representation." 129 A.D.2d at 1318. In making this determination, the court only discussed one of petitioner's bases for ineffective counsel and did not even mention the juror issue in the court's analysis of ineffective counsel. At the end of the Appellate Division's opinion, the court stated that the petitioner's "remaining contentions, to the extent not discussed herein, have been considered and found to be lacking in merit." 129 A.D.3d at 1319.

In *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001), the court held that "[a] court considering ineffective assistance might never reach the underlying constitutional claims, and the rejection of the ineffective assistance claims without detailed comment does not bespeak any necessary ruling on the underlying constitutional claims." *See also McCray v. Capra*, No. 9:15-CV-1129, 2017 WL 38336054, at *7 (N.D.N.Y. Aug. 31, 2017) (citing *Rush v. Lempke*, 500 F. App'x 12, 15 (2d Cir. 2012); *Hall v. Phillips*, No. 04 Civ. 1514, 2007 WL 2156656, at *5 (E.D.N.Y. Jul. 25, 2007) ("As courts in this circuit have consistently recognized, an ineffective assistance claim is an insufficient vehicle for exhausting the underlying allegations when those allegations are asserted

30

for the first time as separate claims on habeas.")).

In this case, petitioner's assertion of ineffective counsel, with one of the bases being the failure to request an interview of the juror who allegedly visited the scene did not exhaust the underlying due process issue which would have been based on juror misconduct.  Based on the Appellate Division's decision regarding one of the other bases for ineffective counsel, chances are that the court never reached the underlying juror misconduct claim.

To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of professional reasonableness, and but for counsel's alleged errors, the result of the proceedings would have been different, and as a result, petitioner suffered prejudice.  *Premo v. Moore*, 562 U.S. 115, 121-22 (2011); *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  In this case, in response to petitioner's claim that his counsel was ineffective because he failed to move for a mistrial after a portion of his interrogation video was played, the court found that petitioner had failed to show the absence of strategic or other legitimate explanation for the failure, even though the video was improperly admitted, and a motion for a mistrial "may" have been appropriate. 129 A.D.2d at 1318. The same was likely true for the failure to request an interview with the juror, even though the court did not discuss that basis for petitioner's claim.  The court could have found a legitimate strategy for counsel's failure to request an interview with the juror,[25] without ever considering the underlying claim of juror misconduct.  Thus, petitioner's juror

---

[25] As discussed below in footnote 26, counsel could have been reluctant to initiate an interview with, and possible dismissal of, a juror who might be resisting a unanimous verdict.

misconduct claim is unexhausted.

Petitioner may not return to state court to exhaust his juror misconduct claim. Petitioner's juror misconduct issue was "record-based," and therefore, should have been properly raised on direct appeal. He has already filed a direct appeal in the Appellate Division. He cannot now return to the Court of Appeals because New York permits only one application for direct review. *Oquendo v. Senkowski*, 452 F. Supp. 2d 359, 368 (S.D.N.Y. 2006) (citing *Spence v. Superintendent*, 219 F.3d 162, 169-70 (2d Cir. 2000); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)); N.Y. Rules of Court, Court of Appeals § 500.20. Petitioner would also be unsuccessful in moving to vacate his conviction pursuant to N.Y. Crim. Proc. Law § 440.10 because the claim would be dismissed due to petitioner's unjustifiable failure to raise the record-based federal claim on direct appeal. *Jackson v. Conway*, 763 F.3d 115, 143-44 (2d Cir. 2014) (citing inter alia § 440.10(2)(c)). The petitioner's claim is, therefore, "deemed exhausted," but is subject to a procedural bar. This procedural bar is independent and adequate, and is consistently applied. *See Clark v. Perez*, 510 F.3d at 393 (discussing § 440.10(2)(c)).

Petitioner has failed to show either cause or prejudice for failing to raise the claim on direct appeal. Petitioner's counsel was aware of the issue, and he chose to focus on the claims that he believed would be more successful. In fact, even though the claim was ultimately ruled "harmless error," counsel successfully argued that the court erred in one of its evidentiary rulings. 129 A.D.3d at 1317. In any event, petitioner would have had to exhaust a separate claim of ineffective assistance of appellate counsel if he were trying to establish cause by claiming that his appellate counsel was

ineffective in failing to raise the juror misconduct claim as a separate issue. *Murray v. Carrier*, 477 U.S. at 489. He has not done so. Petitioner has also failed to show that he is actually innocent.[26] Thus, petitioner's juror misconduct claim may be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the petition be **DENIED and DISMISSED**, and it is

**RECOMMENDED**, that a certificate of appealability be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: February 9, 2018

Hon. Andrew T. Baxter
U.S. Magistrate Judge

---

[26] In any event, the court must point out that a review of the discussion that the court held with the foreperson of the jury showed that no one knew whether the other juror had gone to Hulett Street or, if so, that she had been anywhere near the scene of the crime. Moreover, the juror's alleged "visit" to Hulett Street was for her niece's birthday, not to examine the scene or view any "evidence." There is no indication that she was subjected to any "outside influences" or that the jury was not impartial. Finally, it appears from the discussion that the juror may have been inclined to decide in favor of the petitioner. The jury was having trouble reaching a verdict, and ultimately only found petitioner guilty of two weapons charges. Counsel for petitioner may have declined to question the juror because he sensed that petitioner would have a more favorable result with this jury. The Appellate Division made that finding with respect to petitioner's claim that counsel was ineffective in failing to move for a mistrial on the evidentiary issue. 129 A.D.2d at 1318.